FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

OCT 18 2010

Stephan Harris, Clerk
Cheyenne

Rebecca W. Watson
Brian S. Tooley, *pro hac vice*
Stephen A. Bain, *pro hac vice*
Blake M. Pickett
Welborn Sullivan Meck & Tooley, PC
821 - 17th Street, Suite 500
Denver, CO  80202
303-830-2500 – Telephone
303-832-4473 – Facsimile

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| WESTERN ENERGY ALLIANCE; BASELINE MINERALS, INC.; DOUBLE DEUCE LAND & MINERALS, INC.; NERD GAS COMPANY LLC; WOLD OIL PROPERTIES, INC.; LARAMIE ENERGY II, LLC; and SAMSON RESOURCES COMPANY, <br><br> Plaintiffs, <br><br> vs. <br><br> KEN SALAZAR, in his official capacity as Secretary of the United States Department of the Interior; UNITED STATES DEPARTMENT OF THE INTERIOR; ROBERT ABBEY, in his official capacity as Director, Bureau of Land Management; BUREAU OF LAND MANAGEMENT; DON SIMPSON, in his official capacity as State Director, Wyoming Bureau of Land Management of the Department of the Interior; JUAN PALMA, in his official capacity as State Director, Utah Bureau of Land Management of the Department of the Interior, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. **10CV0226F** |

## COMPLAINT

Plaintiffs, Western Energy Alliance ("Western Energy"), Baseline Minerals, Inc. ("Baseline"), Double Deuce Land & Minerals, Inc. ("Double Deuce"), Nerd Gas Company LLC ("Nerd"), Wold Oil Properties, Inc. ("Wold"), Laramie Energy II, LLC ("Laramie"), Samson Resources Company ("Samson"), by and through their attorneys, Welborn Sullivan Meck & Tooley, P.C., for their Complaint state as follows:

### Nature of Action

1.　This case concerns the failure of the United States Department of the Interior ("DOI") and the Bureau of Land Management ("BLM") to comply with their non-discretionary obligation to issue mineral leases to the top qualified bidders at competitive lease sales within 60 days of the date the leases are paid for as mandated by Congress under the Mineral Leasing Act, 30 U.S.C. § 226(b)(1)(A). Plaintiffs seek an order to compel agency action unlawfully withheld under 5 U.S.C. § 706(1) and 28 U.S.C. § 1361, and declaratory relief under 28 U.S.C. § 2201.

### The Parties

2.　Plaintiff Western Energy, formerly known as the Independent Petroleum Association of Mountain States, is a non-profit corporation with its principal place of business located in Denver, Colorado. Western Energy represents over 400 member companies committed to developing oil and natural gas resources on public lands in Wyoming, Utah and the Intermountain West in an environmentally-responsible manner. Members of Western Energy are actively engaged in bidding at competitive sales of federal oil and gas leases in the Rocky Mountain States, including Wyoming and Utah.

2

3.      Plaintiff Baseline is a Colorado corporation in good standing, duly qualified to conduct business in the States of Wyoming and Utah, with its principal place of business located in Denver, Colorado.

4.      Plaintiff Double Deuce is a Colorado corporation in good standing, duly qualified to conduct business in the State of Wyoming, with its principal place of business located in Aurora, Colorado.

5.      Plaintiff Nerd is a Delaware limited liability company in good standing, duly qualified to conduct business in the State of Wyoming, with its principal place of business located in Casper, Wyoming.

6.      Plaintiff Wold is a Wyoming corporation in good standing, duly qualified to conduct business in the State of Wyoming, with its principal place of business located in Casper, Wyoming.

7.      Plaintiff Laramie is a Delaware limited liability company in good standing, duly qualified to conduct business in the State of Wyoming, with its principal place of business located in Denver, Colorado.

8.      Plaintiff Samson is an Oklahoma corporation in good standing, duly qualified to conduct business in the States of Wyoming and Utah, with its principal place of business located in Tulsa, Oklahoma.

9.      Defendant Ken Salazar is the Secretary of the DOI (the "Secretary"). Plaintiffs sue the Secretary in his official capacity as the Secretary of the DOI. The Secretary is responsible for the management of federal oil and gas resources in the United States.

10.     Defendant DOI is a federal department of the Executive Branch of the United States Government responsible for the management of federal lands and the leasing of federal oil and gas resources.  DOI manages approximately 500 million acres of land and approximately 700 million acres of mineral estate in the United States.

11.     Defendant Robert Abbey is the Director of the Bureau of Land Management ("Director Abbey").  Plaintiffs sue Director Abbey in his official capacity as the Director of the BLM.  Director Abbey is responsible for the management of the public lands and on-shore federal mineral resources.

12.     Defendant BLM is a federal bureau within the DOI responsible for the management of 264 million acres of public land and 700 million acres of federal mineral estate and is responsible for the leasing of on-shore federal oil and gas resources.

13.     Defendant Don Simpson is the Director of the BLM Wyoming State Office ("Director Simpson").  Plaintiffs sue Director Simpson in his official capacity as State Director of the Wyoming BLM.  The BLM Wyoming State Office manages approximately 18 million acres of federal surface and 40 million acres of federal mineral estate in Wyoming.

14.     Defendant Juan Palma is the Director of the BLM Utah State Office ("Director Palma").  Plaintiffs sue Director Palma in his official capacity as State Director of the Utah BLM. The BLM Utah State Office manages approximately 23 million acres of federal surface and 32 million acres of mineral estate in Utah.

4

## Jurisdiction and Venue

15.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 in that Plaintiffs' claims arise under the Mineral Leasing Act, 30 U.S.C. § 226, the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), the federal mandamus statute, 28 U.S.C. § 1361, and the federal declaratory judgment statute, 28 U.S.C. § 2201.

16.    Venue is proper in this Court under 28 U.S.C. § 1391(e) in that Defendants are officers of the United States, a substantial part of the events and omissions giving rise to the claims occurred in Wyoming, and a substantial part of the property that is the subject of the action is situated in Wyoming.

## General Allegations

17.    The Mineral Leasing Act of 1920, 30 U.S.C. § 181, *et seq*., as amended by the Federal Onshore Oil and Gas Leasing Reform Act of 1987, Pub. L. No. 100-203 ("the Reform Act"), authorizes leasing of federal oil and gas underlying BLM, national forest, and other federal lands, as well as private lands where the federal government has retained mineral rights.

18.    The Reform Act amended in a number of significant ways the Mineral Leasing Act.  Among other things, the Reform Act restructured and reformed the federal oil and gas leasing system by imposing a requirement that all public domain and acquired lands available for leasing first be offered for leasing at competitive lease sales with oral bidding.

19.    Under the Mineral Leasing Act, as amended, BLM is directed to hold quarterly lease sales "for each State where eligible lands are available," and more frequently if the Secretary of the Interior determines such sales are necessary.  30 U.S.C. § 226(b)(1)(A).

20.     The Mineral Leasing Act vests the Secretary with discretion at the outset to determine which public lands are suitable for leasing: "[a]ll lands subject to disposition under this chapter which are known or believed to contain oil or gas deposits may be leased by the secretary." 30 U.S.C. § 226(a). Once the Secretary determines that particular lands are appropriate for oil and gas leasing, however, the Mineral Leasing Act directs that "[a]ll lands to be leased . . . shall be leased as provided in this paragraph to the highest responsible qualified bidder by competitive bidding . . . ." 30 U.S.C. § 226(b)(1)(A). The Mineral Leasing Act also directs that "[t]he Secretary **shall accept** the highest bid from a responsible qualified bidder which is equal to or greater than the national minimum acceptable bid" of $2 per acre. *Id.* (emphasis added).

21.     The Mineral Leasing Act further mandates that "[l]eases **shall be issued** within 60 days following payment by a successful bidder of the remainder of the bonus bid, if any, and the annual rental for the first lease year." 30 U.S.C. § 226(b)(1)(A) (emphasis added). Thus, the Secretary, or his delegate, has a non-discretionary statutory obligation to issue leases within 60 days of full payment by the highest responsible qualified bidder.

22.     Consistent with the requirements of the Mineral Leasing Act, BLM's leasing regulations provide that prior to holding a competitive lease sale, the authorized officer may "suspend the offering of a specific parcel while considering a protest or appeal against its inclusion in a Notice of Competitive Lease Sale." 43 C.F.R. § 3120.1-3. When a parcel is included in a "Notice of Competitive Lease Sale" and the authorized officer has not suspended the offering of that parcel, however, BLM regulations provide that the parcel "shall be offered by

6

oral bidding," 43 C.F.R. § 3120.5-1(a), that a "winning bid shall be the highest oral bid by a

qualified bidder, equal to or exceeding the national minimum acceptable bid," 43 C.F.R. § 3120-

5-1(b), and that "a lease shall be awarded to the highest responsible qualified bidder." 43 C.F.R.

§ 3120.5-3(b).

23.     In the course of responding to public comments in the promulgation of its

regulations implementing the Reform Act, the BLM acknowledged that the 60-day period to

issue leases in the Mineral Leasing Act is mandatory:

> Several comments on § 3120.5-3(b) of the proposed rulemaking pointed out that
> the Reform Act requires that competitive leases be issued within 60 days from the
> date of the sale. The comments requested that this requirement be specified in the
> final rulemaking. The recommendation is not adopted. The Bureau is committed
> to adhere to the time frame **required by the Reform Act,** and no purpose is
> served by repeating the requirement in the final rulemaking.

53 Fed. Reg. 22814, 22831 (June 17, 1988) (emphasis added).

24.     Despite BLM's recognition of the mandatory nature of the 60-day time period

under the Mineral Leasing Act to issue leases, Defendants have adopted a practice and policy of

not complying with the express mandate of Congress.

25.     BLM's Handbook 3120-1 – Competitive Leases states at Section II.G:

> If a protest is received on the holding of a lease sale or the inclusion of a specific
> parcel in the sale, while the merits of the protest are being considered, the State
> Director may either elect to hold the sale or suspend the entire lease sale (or
> offering of the parcel). . . . If a bid is received on any parcel involved in the
> protest, the protest must be resolved before issuance of the involved lease.
> (Emphasis in Handbook.)

26.     BLM has also announced in past notices of competitive sales of oil and gas leases,

and continues to state in current notices of upcoming competitive lease sales:

*If I am the high bidder at the sale for a protested parcel, when will BLM issue my
lease?*

We will make every effort to decide the protest within 60 days after the sale. We
will issue no lease for a protested parcel until the State Director makes a decision
on the protest. If the State Director denies the protest, we will issue your lease
concurrently with that decision.

*If I am the successful bidder of a protested parcel, may I withdraw my bid and
receive a refund of my first year's rental and bonus bid?*

No. In accordance with BLM regulations (43 CFR 3120.5-3) you may not
withdraw your bid.

BLM Wyoming State Office, Notice of Competitive Oil and Gas Lease Sale on

November 2, 2010 (Sept. 17, 2010) (excerpts attached as Exhibit A).

27.     The Secretary has approved and directed the policy of not issuing leases for

protested parcels to the highest qualified bidders at competitive lease sales within the 60-day

deadline specified in the Mineral Leasing Act and has made this policy part of his recent reform

of onshore oil and gas leasing.

28.     In 2010, Secretary Salazar announced several reforms that the BLM will

undertake to, in part, "reduce potential conflicts that can lead to costly and time consuming

protests and litigation of leases." U.S. Department of the Interior Press Release, "Secretary

Salazar Launches Onshore Oil and Gas Leasing Reforms to Improve Certainty, Reduce Conflicts

and Restore Balance on U.S. Lands" (January 6, 2010).

8

29.    On January 6, 2010, the Secretary further issued Secretarial Order No. 3294, "Energy Management Reform," establishing the Department policy regarding reform of its energy management and the Energy Reform Team of the Office of the Assistant Secretary, Land and Minerals Management to carry out the Secretary's oil and gas leasing reform policy for the BLM.

30.    On May 17, 2010, Secretary Salazar announced the issuance by BLM of the onshore oil and gas leasing reforms. BLM News Release, "Interior Finalized Onshore Oil and Gas Leasing Reforms." "As part of Secretary of the Interior Ken Salazar's ongoing agenda to change how the Department of the Interior does business, the Bureau of Land Management today finalized several reforms to its oil and gas programs . . . . 'The BLM reforms we are finalizing today establish a more orderly, open, and environmentally sound process for developing oil and gas resources on public lands.'"   The BLM issued Instruction Memorandum No. 2010-117 on May 17, 2010 as part of the Secretary's oil and gas leasing reforms.

31.    On May 17, 2010, as part of the Secretary's effort to reform the onshore oil and gas leasing process, the Director of BLM issued Instruction Memorandum No. 2010-117, in which he acknowledged that the issuance of protested leases may be "held up."   Section III(I) of the Instruction Memorandum provides in pertinent part:

> Before issuing a lease, the authorized officer at the state office will (1) sign decisions resolving all protests concerning the parcel, and (2) sign a decision record (or record of decision for an EIS) supporting issuance of the lease(s) that provides a rationale for the leasing decision, taking into account, among other things, the NEPA analysis. If a particular parcel or parcels are not the subject of a protest, sale or issuance of such parcels should not be held up pending resolution of protests on any other parcels proposed for sale.

9

The Instruction Memorandum makes clear that it is BLM policy not to issue a lease until all protests concerning that parcel have been resolved.  Although parcels that are not protested will not be "held up," the Instruction Memorandum implies that any protested parcels will be.

33.    Defendants' policy, practice and continuing decisions not to issue leases to the successful qualified bidders at competitive lease sales within the 60-day period required by the Mineral Leasing Act where there are pending unresolved protests is contrary to Congress' clear intent and direction in the Mineral Leasing Act that requires mineral leases be issued within 60 days after the successful qualified bidder has paid for them.

33.    The 60-day mandatory period imposed by Congress under the Mineral Leasing Act for issuing leases ensures that environmental and competing land use considerations are evaluated, first, before a decision is made to auction parcels of federal lands.  It also provides certainty to bidders that if a bidder is the highest qualifying, responsible bidder for a lease at a competitive lease sale that the lease will be issued within the 60-day period mandated by Congress and that its investment capital will not be held by the government for an indefinite or prolonged period of time.

34.    While the Secretary may withdraw a parcel and not offer it at a competitive lease sale on the basis of a protest, once the parcel is put up for sale at a competitive lease auction and the government accepts the qualified high bidder's lease bonus payment and first year rental payment, the Mineral Leasing Act mandates that the leases "shall" be issued within 60 days thereafter.

35.     The Defendants have consistently failed to comply with the mandate of Congress that leases "shall" be issued to the highest qualified bidder at a competitive lease sale within 60 days after the successful qualified bidder has paid for them. The United States Government Accountability Office ("GAO"), in its Report to the Chairman, Committee on Natural Resources, House of Representatives, "Onshore Oil and Gas, BLM's Management of Public Protests to its Lease Sales Needs Improvement," (GAO-10-670, July 30, 2010) ("GAO  Lease Sale Report"), studied lease sales between 2007-2009 in four states, including Wyoming and Utah, and found 74% of competitively sold lease parcels were protested and that "a majority of leases [some 91%] for protested parcels . . . were issued after the 60-day window specified in the Mineral Leasing Act." GAO Lease Sale Report at 19.

36.     As to lease issuance in Utah and Wyoming, the GAO found that BLM failed to issue leases for protested parcels within the 60-day period more than 91% of the time in Utah and "up to almost 100 percent in Wyoming." Lease Sale Report at 19.  The GAO further reported that "[a]ccording to BLM officials, as of May 2010, the agency was holding more than $84 million in industry payments for unissued leases in Wyoming and more than $10 million in Utah." *Id.* at 21.

37.     Wilma A. Lewis, Assistant Secretary, Lands and Minerals Management for DOI, in response to the GAO Lease Sale Report, recently advised the GAO that the DOI agrees with the recommendations to "improve the BLM's ability to adequately address a protest within the timeframes **required** for lease issuance under the Mineral Leasing Act." Letter to Frank Rusco

(July 14, 2010) (emphasis added), attached as Appendix IV to GAO Lease Sale Report, Appendix IV.

38.     Defendants' policy, practice and continuing decisions not to issue mineral leases within the 60-day period required by the Mineral Leasing Act is contrary to Congress' clear intent and direction in the Mineral Leasing Act.

## First Claim for Relief

## (Compelling Agency Action Wrongfully Withheld in Violation of 30 U.S.C. § 226(b)(1)(A))

39.     Plaintiffs incorporate the allegations above by reference.

40.     Plaintiff Baseline was the highest qualifying bidder for leases at federal lease sales.  Baseline has paid a total of $2,819.960.28 for 73 separate leases during lease sales that took place in Utah and Wyoming in November 2005, February 2006, May 2006, August 2006, August 2008, October 2008, February 2009, April 2009, August 2009, October 2009, February 2010, May 2010 and August 2010.  These leases are described in Exhibit B.  The Secretary has not issued any of these leases.

41.     Plaintiff Double Deuce was the highest qualifying bidder for leases at federal lease sales.  Double Deuce has paid a total of $1,257,706.50 for 17 separate leases during lease sales that took place in Wyoming in December 2008 and August 2009.  These leases are described in Exhibit C.  The Secretary has not issued any of these leases.

42.     Plaintiff Nerd was the highest qualifying bidder for leases at federal lease sales.  Nerd has paid a total of $260,922.50 for 25 separate leases during lease sales that took place in Wyoming in October 2008, December 2008, February 2009, April 2009, October 2009, February

2010, May 2010, and August 2010. These leases are described in Exhibit D. The Secretary has not issued any of these leases.

43.     Plaintiff Wold was the highest qualifying bidder for leases at federal lease sales. Wold has paid a total of $184,661.50 for three separate leases during lease sales that took place in Wyoming in August 2009, October 2009 and August 2010. These leases are described in Exhibit E. The Secretary has not issued any of these leases.

44.     Plaintiffs Baseline, Double Deuce, Nerd, and Wold (the "Purchasing Plaintiffs") complied with all statutory, regulatory and BLM requirements, and their purchased lease parcels were not administratively or technically defective.

45.     The mineral leases described in Exhibits B-E are referred to as the "Leases." The Purchasing Plaintiffs promptly paid in full for their parcels sold at the competitive lease auctions, including their bonus bids and the annual rental for the first lease year, and BLM accepted such payments.

46.     Plaintiffs Laramie and Samson have contractual rights relating to some of the Leases, and therefore they have an interest in the Leases being issued.

47.     Despite having been paid in full, Defendants have not issued any of the Leases bought by Plaintiffs in clear violation of the Mineral Leasing Act.

48.     In addition to the leases listed in Exhibits B-E that should have been issued to the Purchasing Plaintiffs, Defendants have failed to issue hundreds of other leases on a timely basis to companies that are members of Western Energy. GAO Lease Sale Report at 19-21.

49.     Every day that passes without the issuance of the leases to the Purchasing Plaintiffs constitutes a separate violation of the Mineral Leasing Act.  Such violations are continuing and will likely continue absent relief from this court.

50.     Defendants are violating the Mineral Leasing Act, 30 U.S.C. § 226(b)(1)(A), by failing to issue leases to the Purchasing Plaintiffs within 60 days of their successful bids and acceptance of their bonus payments and first annual lease rental payment.

51.     Defendants' failure to issue the leases constitutes agency action unlawfully withheld and unreasonably delayed under 5 U.S.C. § 706(1).

52.     The ongoing decisions of Defendants to continue to delay the issuance of leases to the Purchasing Plaintiffs beyond the 60-day period mandated by the Mineral Leasing Act constitutes effective final agency action under the APA for which no other relief is available and also constitutes a justiciable controversy under the federal mandamus statute, 28 U.S.C. § 1361.

53.     The agency actions that are the subject of this Complaint are final agency actions subject to review in this Court.  There are no administrative remedies to exhaust.  The policy of not issuing leases within the 60-day period was directed from the Office of the Secretary or at the secretarial level.  An administrative appeal to DOI for its failure to issue leases in the time period mandated by the Mineral Leasing Act is not required by statute or any rule adopted by DOI.  Defendants continue to implement their actions without issuing an appealable decision, and there is no administrative remedy that would grant adequate relief.  The Defendants' ongoing delay and failure to act are subject to and ripe for judicial review under the APA and the federal mandamus statute, 28 U.S.C. § 1361.

54.     Plaintiffs request that this Court compel Defendants to issue the mineral leases for which the Purchasing Plaintiffs have paid, 5 U.S.C. § 706(1) and 28 U.S.C. § 1361, and order Defendants to issue all of the Leases identified in Exhibits B-E.

### Second Claim for Relief
### (Declaratory Judgment)

55.     Plaintiffs incorporate the above allegations by reference.

56.     Defendants have adopted a policy and practice, approved and directed by the Secretary, of not issuing leases for protested parcels to the highest qualified bidders at competitive lease sales within 60 days following payment by the successful bidders of the bonus bid and the annual rentals for the first lease year.

57.     Defendants are continuing to follow and implement this policy and practice by announcing to prospective bidders at upcoming competitive lease auctions that no leases shall be issued on protested parcels until the State Director makes a decision on the protests, and by announcing that bidders may not withdraw their bids if their leases are not issued within 60 days after they make all required payments.  43 C.F.R. § 3120.5-3.

58.     Defendants' actions in announcing to prospective bidders at upcoming competitive lease auctions that no lease shall be issued for protested parcels until the State Director makes a decision on the protest at some unspecified time creates uncertainty as to the legal rights and obligations of prospective bidders and the federal government.

59.     The uncertainty created by Defendants' policy and practice is currently affecting the decisions of bidders at lease auctions.  Bidders, including members of Western Energy and

the other named Plaintiffs, are uncertain about their rights and obligations and how long their investment capital in the form of their federal lease bids will be held by the government. This uncertainty is having a current and existing impact on their decisions about whether to bid and how much to bid at federal competitive lease sales.

60.     Defendants' policy and practice of not issuing leases within the 60-day period mandated by the Mineral Leasing Act while retaining, sometimes for years, the lease bonus and first year rental payments paid by Plaintiffs creates uncertainty as to when successful bidders can expect either their leases to issue or their money to be refunded by the Defendants. Defendants' policy and practice also impacts the availability of Plaintiffs' capital for productive uses. The Defendants hold over $100 million dollars of lease payments paid by Western Energy members in the anticipation that leases would timely issue and development of federal oil and gas would occur in an orderly fashion. Instead, the lease payments are held by the Defendants in an unproductive capacity for months and years with no certainty as to when either the leases will be issued or the lease payments refunded. This policy and practice of retaining Plaintiffs' capital in an unproductive, non-interest bearing account for an uncertain period is having a current and existing impact on the budgets, development plans and ongoing operations of federal lease bidders, including the membership of Western Energy.

61.     Plaintiffs seek a declaratory judgment to resolve these existing impacts and uncertainties, including a declaration as to whether the government may lawfully delay issuance of a lease after 60 days have passed from the date the government accepts the highest qualifying

bidder's lease bonus bid amount and the first year lease rental payment while continuing to hold the highest qualifying bidder's money for an indefinite period.

62.     Defendants' policy of not issuing leases within 60 days of receiving payment for them violates Section 226(b)(1)(A) of the Mineral Leasing Act.

63.     Plaintiffs request that this Court declare that Defendants' policy of not issuing mineral leases within the 60-day period is illegal and contrary to Congress' clear intent and direction in the Mineral Leasing Act.

64.     Plaintiffs further request that this Court order and declare that where the Secretary has exercised its discretion to include a parcel in a competitive lease sale, the Defendants are obligated to issue a lease for that parcel within 60 days after the highest qualifying bidder pays the bid bonus payment and the first year lease rental payment, as mandated by the Mineral Leasing Act.

WHEREFORE, Plaintiffs respectfully request that this Court:

A.     Order Defendants to issue the Leases with no further delay;

B.     Declare that Defendants' policy of not issuing mineral leases within 60 days is illegal and contrary to Congress' clear intent and direction in the Mineral Leasing Act;

C.     Declare that when the Secretary has exercised its discretion to include a protested parcel in a competitive oil and gas lease sale, that the State Director is obligated to issue a lease for that parcel to the highest qualifying bidder within 60 days from

the date that bidder has paid its bonus bid amount and first year lease rental

payment and that any DOI policy and practice to the contrary is prohibited;

D.   Order Defendants to issue all leases in the future within 60 days of receiving

payment as required under the Mineral Leasing Act; and

E.   Grant such other and further relief as justice may require.

Dated this 15th day of October, 2010.

Respectfully submitted,

WELBORN SULLIVAN MECK & TOOLEY, PC

Rebecca W. Watson

Rebecca W. Watson
Brian S. Tooley, *pro hac vice*
Stephen A. Bain, *pro hac vice*
Blake M. Pickett


WELBORN SULLIVAN MECK & TOOLEY, PC
123 West 1st Street, Suite 100
Casper, WY  82601

*and*

WELBORN SULLIVAN MECK & TOOLEY, PC
821 - 17th Street, Suite 500
Denver, CO  80202
303-830-2500

*ATTORNEYS FOR PLAINTIFFS*

**Exhibit A**



# Notice
## of
# Competitive
# Oil and Gas
# Lease Sale

## November 2, 2010

BLM

Wyoming State Office – Oil and Gas

NATIONAL SYSTEM OF PUBLIC LANDS

**Exhibit A**



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Wyoming State Office
5353 Yellowstone Road
Cheyenne, Wyoming 82009
P.O. Box 1828
Cheyenne, Wyoming 82003-1828
http://www.blm.gov/wy/

September 17, 2010

## Notice of Competitive Oil and Gas Lease Sale

We wish to announce that in accordance with 43 CFR Part 3120, we will offer for competitive sale certain land in the States of Wyoming and Nebraska for Federal oil and gas leasing. This notice describes-

- The time and place of the sale;
- How the sale will be conducted;
- How to participate in the bidding process;
- The sale process;
- How long the sale will last;
- The conditions of the sale;
- How to file a noncompetitive offer after the sale;
- How to file a presale noncompetitive offer; and
- How to file a protest for land offered in this Notice.

Beginning on page 1 of this Notice is a list of the land we are offering at this sale. The land is described by parcel number and legal land description. They are listed in Range and Township order by state and land type and will be offered in that sequence. Below each parcel we have included any stipulations, lease notices, special conditions, or restrictions that will be made a part of the lease at the time we issue it. We have also identified those parcels where the United States owns less than 100 percent interest in the oil and gas mineral rights, have pending presale noncompetitive offers to lease, and are not available for noncompetitive offers to lease if they receive no bid at this sale. For your convenience, we are also including copies of the stipulations, lease notices, etc. affecting the parcels in this sale.

Both this Sale Notice and the results list will be available on our public Internet site at: http://www.blm.gov/wy.  This Notice also is available on the BLM home page at: http://www.blm.gov.

Oil and gas forms are available on the Internet at: www.blm.gov/blmforms.

1

## Exhibit A

## When and where will the sale take place?

**When:**     The competitive sale will begin at 8:00 a.m. on Tuesday, **November 2, 2010**. The sale room and receiving room will open one hour earlier so you can register and get your bidding number.

**Where:**    We will hold the sale at the Holiday Inn, Convention Center, 204 West Fox Farm Road (I-80 and US85), Cheyenne, Wyoming. A block of rooms at the rate of $70.00 for single occupancy and $80.00 for double occupancy has been reserved for sale participants at the Holiday Inn. For room reservations, contact the Holiday Inn at (307) 638-4466. When making room reservations, please state that you are attending the **BLM Oil and Gas Auction.**

**Access:**   The sale room is accessible to persons with disabilities. If you need an auxiliary aid or service to participate in the sale, such as sign language interpreter or materials in an alternate format, contact **Sue Moberley at (307) 775-6175** or **JoAnne Best at (307) 775-6253** by **October 19, 2010**.

## How will the sale be conducted?

The sale will be conducted by oral auction. You must make your bids verbally. The winning bid is the highest verbal bid equal to or exceeding the national minimum acceptable bid.

## How do I participate in the bidding process?

To participate in the bidding process, you must fill out a registration form identifying the lessee's name and address that will be shown on the lease form and get a bidder number. If you are bidding for more than one party, you must register and obtain a separate bidder number for each company or individual you represent. We will begin registering bidders at 7:00 a.m. on the day of the sale in the receiving room. You must display your bidder number to the auctioneer when you make a bid.

When you register to bid, you will be required to show a valid government-issued photo identification (ID) to verify your identity. If you do not provide a valid photo ID, you will not be allowed to register as a bidder and participate in the auction.

You will also be asked to sign a statement to confirm that any bid you cast will represent a good-faith intention to acquire an oil and gas lease and that you understand that any winning bid will constitute a legally binding commitment to accept the lease and pay monies owed, whether or not a lease is subsequently issued. Further, you will acknowledge that you understand it is a crime under 18 U.S.C. 1001 and 43 U.S.C. 1212 to knowingly and willfully make any false, fictitious or fraudulent statements or representations regarding your qualifications; bidder registration and intent to bid; acceptance of a lease; or payment of monies owed; and that any such offense may result in a fine or imprisonment for not more than 5 years or both. You will also acknowledge

ii

**Exhibit A**

- If the party signing the protest is doing so on behalf of an association, partnership or corporation, the signing party must reveal the relationship between them. For example, unless an environmental group authorizes an individual member of its group to act for it, the individual cannot make a protest in the group's name.

## If BLM receives a timely protest of a parcel advertised on this Sale Notice, how does it affect bidding on the parcel?

We will announce receipt of any protests at the beginning of the sale. We will also announce a decision to either withdraw the parcel or proceed with offering it at the sale.

## If I am the high bidder at the sale for a protested parcel, when will BLM issue my lease?

We will make every effort to decide the protest within 60 days after the sale. We will issue no lease for a protested parcel until the State Director makes a decision on the protest. If the State Director denies the protest, we will issue your lease concurrently with that decision.

## If I am the successful bidder of a protested parcel, may I withdraw my bid and receive a refund of my first year's rental and bonus bid?

No. In accordance with BLM regulations (43 CFR 3120.5-3) you may not withdraw your bid.

## If BLM upholds the protest, how does that affect my competitive bid?

If we uphold a protest and withdraw the parcel from leasing, we will refund your first year's rental, bonus bid and administrative fee. If the decision upholding the protest results in additional stipulations, we will offer you an opportunity to accept or reject the lease with the additional stipulations prior to lease issuance. If you do not accept the additional stipulations, we will reject your bid and we will refund your first year's rental, bonus bid and administrative fee.

## If BLM's decision to uphold the protest results in additional stipulations, may I appeal that decision?

Yes, you may. Note, an appeal from the State Director's decision must meet the requirements of Title 43 CFR §4.411 and Part 1840.

## May I appeal BLM's decision to deny my protest?

Yes, you may. Note, an appeal from the State Director's decision must meet the requirements of Title 43 CFR §4.411 and Part 1840.

**EXHIBIT B**
**BASELINE - UTAH**

| Sale Date | Federal Lease Number | Total Acres | Total Amount Paid |
|---|---|---|---|
| 11/15/2005 | UTU-084130 | 1917.76 | $3,836.00 |
| 11/15/2005 | UTU-084131 | 2560.00 | $5,120.00 |
| 11/15/2005 | UTU-084132 | 640.00 | $2,240.00 |
| 11/15/2005 | UTU-084133 | 1280.00 | $3,840.00 |
| 11/15/2005 | UTU-084134 | 640.00 | $19,200.00 |
| 11/15/2005 | UTU-084135 | 1313.00 | $21,008.00 |
| 11/15/2005 | UTU-084137 | 1312.00 | $15,744.00 |
| 11/15/2005 | UTU-084138 | 1304.00 | $4,564.00 |
| 11/15/2005 | UTU-084139 | 1245.00 | $6,225.00 |
| 11/15/2005 | UTU-084140 | 640.00 | $8,320.00 |
| 11/15/2005 | UTU-084141 | 640.00 | $7,040.00 |
| 11/15/2005 | UTU-084142 | 1280.00 | $14,080.00 |
| 11/15/2005 | UTU-084143 | 1246.00 | $11,214.00 |
| 11/15/2005 | UTU-084144 | 1920.00 | $21,120.00 |
| 11/15/2005 | UTU-084147 | 2471.28 | $27,192.00 |
| 11/15/2005 | UTU-084148 | 1194.16 | $13,145.00 |
| 11/15/2005 | UTU-084149 | 1920.00 | $21,120.00 |
| 11/15/2005 | UTU-084150 | 1239.88 | $13,640.00 |
| 2/21/2006 | UTU-084315 | 1278.96 | $7,034.28 |
| 2/21/2006 | UTU-084321 | 1215.00 | $38,880.00 |
| 2/21/2006 | UTU-084324 | 2558.45 | $19,192.50 |
| 2/21/2006 | UTU-084326 | 2559.12 | $16,640.00 |
| 2/21/2006 | UTU-084327 | 2559.72 | $18,560.00 |
| 2/21/2006 | UTU-084328 | 1829.92 | $16,470.00 |
| 2/21/2006 | UTU-084329 | 2560.00 | $30,720.00 |
| 2/21/2006 | UTU-084330 | 2560.00 | $28,160.00 |
| 2/21/2006 | UTU-084331 | 1280.00 | $25,600.00 |
| 5/16/2006 | UTU-084607 | 2019.48 | $4,040.00 |
| 5/16/2006 | UTU-084608 | 2240.00 | $21,280.00 |
| 5/16/2006 | UTU-084609 | 640.00 | $1,280.00 |
| 5/16/2006 | UTU-084610 | 1918.72 | $3,838.00 |
| 5/16/2006 | UTU-084611 | 1920.00 | $3,840.00 |
| 5/16/2006 | UTU-084612 | 1920.00 | $3,840.00 |
| 5/16/2006 | UTU-084644 | 2012.88 | $18,117.00 |
| 5/16/2006 | UTU-084645 | 2560.00 | $7,680.00 |
| 5/16/2006 | UTU-084646 | 2560.00 | $15,360.00 |
| 5/16/2006 | UTU-084647 | 2560.00 | $12,800.00 |
| 5/16/2006 | UTU-084648 | 640.00 | $14,080.00 |
| 8/16/2006 | UTU-084946 | 302.89 | $18,180.00 |
| | | | |
| **TOTAL** | | **64,458.22** | **$544,239.78** |

**EXHIBIT B**
**BASELINE - WYOMING**

| Sale Date | Federal Lease Number | Total Acres | Total Amount Paid |
|---|---|---|---|
| 8/5/2008 | WYW-177175 | 2506.33 | $46,519.50 |
| 10/7/2008 | WYW-177498 | 2550.60 | $89,285.00 |
| 10/7/2008 | WYW-177369 | 2492.90 | $4,986.00 |
| 10/7/2008 | WYW-177370 | 1640.00 | $19,680.00 |
| 2/5/2009 | WYW-178045 | 1785.20 | $35,720.00 |
| 2/5/2009 | WYW-178052 | 1696.89 | $64,486.00 |
| 4/7/2009 | WYW-178193 | 965.20 | $13,524.00 |
| 4/7/2009 | WYW-178194 | 880.00 | $15,840.00 |
| 4/7/2009 | WYW-178195 | 800.00 | $124,000.00 |
| 4/7/2009 | WYW-178199 | 80.00 | $880.00 |
| 4/7/2009 | WYW-178200 | 120.00 | $2,640.00 |
| 4/7/2009 | WYW-178201 | 160.00 | $3,520.00 |
| 4/7/2009 | WYW-178202 | 625.92 | $13,722.00 |
| 4/7/2009 | WYW-178204 | 1360.00 | $5,440.00 |
| 4/7/2009 | WYW-178205 | 621.32 | $6,220.00 |
| 4/7/2009 | WYW-178212 | 2281.55 | $13,692.00 |
| 4/7/2009 | WYW-178218 | 2560.00 | $20,480.00 |
| 8/4/2009 | WYW-178522 | 120.00 | $1,440.00 |
| 8/4/2009 | WYW-178524 | 309.42 | $3,720.00 |
| 8/4/2009 | WYW-178525 | 2239.28 | $26,880.00 |
| 10/2/2009 | WYW-178728 | 640.00 | $89,600.00 |
| 10/2/2009 | WYW-178729 | 1280.00 | $192,000.00 |
| 10/2/2009 | WYW-178730 | 640.00 | $89,600.00 |
| 10/2/2009 | WYW-178731 | 1008.31 | $141,260.00 |
| 2/2/2010 | WYW-178965 | 615.67 | $5,544.00 |
| 2/2/2010 | WYW-178968 | 1149.92 | $161,000.00 |
| 5/11/2010 | WYW-179185 | 320.00 | $199,025.00 |
| 5/11/2010 | WYW-179148 | 317.80 | $739,350.00 |
| 5/11/2010 | WYW-179150 | 160.00 | $89,600.00 |
| 8/3/2010 | WYW-179296 | 1112.62 | $6,678.00 |
| 8/3/2010 | WYW-179298 | 199.27 | $5,800.00 |
| 8/3/2010 | WYW-179299 | 2127.36 | $14,896.00 |
| 8/3/2010 | WYW-179300 | 2120.00 | $23,320.00 |
| 8/3/2010 | WYW-179301 | 596.11 | $5,373.00 |
| | | | |
| **TOTAL** | | **38,081.67** | **$2,275,720.50** |

## EXHIBIT C
## DOUBLE DEUCE - WYOMING

| Sale Date | Federal Lease Number | Total Acres | Total Amount Paid |
|-----------|---------------------|-------------|-------------------|
| 12/02/08 | WYW-177718 | 1520.33 | $118,017.50 |
| 12/02/08 | WYW-177719 | 1600.00 | $125,740.00 |
| 12/02/08 | WYW-177720 | 1268.00 | $112,358.00 |
| 12/02/08 | WYW-177726 | 642.84 | $44,185.50 |
| 12/02/08 | WYW-177727 | 1280.00 | $91,660.00 |
| 12/02/08 | WYW-177730 | 320.00 | $26,540.00 |
| 12/02/08 | WYW-177731 | 280.00 | $23,520.00 |
| 12/02/08 | WYW-177732 | 2400.00 | $202,940.00 |
| 12/02/08 | WYW-177733 | 440.00 | $39,080.00 |
| 12/02/08 | WYW-177735 | 1349.77 | $95,315.00 |
| 12/02/08 | WYW-177736 | 640.00 | $45,260.00 |
| 12/02/08 | WYW-177737 | 840.00 | $65,240.00 |
| 12/02/08 | WYW-177741 | 1851.63 | $143,670.00 |
| 12/02/08 | WYW-177742 | 960.00 | $77,420.00 |
| 12/02/08 | WYW-177743 | 544.72 | $34,202.50 |
| 08/04/09 | WYW-178506 | 1269.11 | $4,585.00 |
| 08/04/09 | WYW-178509 | 2237.85 | $7,973.00 |
|  |  |  |  |
| **TOTAL** |  | **19,444.25** | **$1,257,706.50** |

**EXHIBIT D**
**NERD - WYOMING LEASES**

| Sale Date | Federal Lease Number | Total Acres | Total Amount Paid |
|---|---|---|---|
| 10/7/2008 | WYW-177336 | 160 | $3,580.00 |
| 12/2/2008 | WYW-177745 | 1808 | $6,468.00 |
| 12/2/2008 | WYW-177746 | 1849 | $6,611.50 |
| 12/2/2008 | WYW-177747 | 1960 | $7,000.00 |
| 12/2/2008 | WYW-177766 | 2160 | $7,700.00 |
| 12/2/2008 | WYW-177767 | 560 | $8,820.00 |
| 12/2/2008 | WYW-177788 | 1939 | $10,804.50 |
| 2/3/2009 | WYW-178000 | 2478 | $55,895.00 |
| 2/3/2009 | WYW-178016 | 240 | $5,060.00 |
| 2/3/2009 | WYW-178020 | 2440 | $18,440.00 |
| 2/3/2009 | WYW-178022 | 880 | $3,220.00 |
| 2/3/2009 | WYW-178070 | 640 | $13,900.00 |
| 2/3/2009 | WYW-178021 | 2323 | $8,270.50 |
| 4/7/2009 | WYW-178190 | 2229 | $23,544.50 |
| 10/2/2009 | WYW-178711 | 1877 | $27,361.50 |
| 10/2/2009 | WYW-178712 | 2537 | $24,246.50 |
| 10/2/2009 | WYW-178713 | 240 | $4,105.00 |
| 10/2/2009 | WYW-178715 | 160 | $1,665.00 |
| 10/2/2009 | WYW-178716 | 1001 | $3,648.50 |
| 10/2/2009 | WYW-178717 | 120 | $565.00 |
| 2/2/2010 | WYW-178932 | 400 | $3,545.00 |
| 2/2/2010 | WYW-178955 | 40 | $2,005.00 |
| 2/2/2010 | WYW-178956 | 88 | $3,797.00 |
| 5/11/2010 | WYW-179121 | 600 | $4,045.00 |
| 8/3/2010 | WYW-179288 | 160 | $6,625.00 |
|  |  |  |  |
| **TOTAL** |  | **28,899** | **$260,922.50** |

**EXHIBIT E**
**WOLD - WYOMING**

| Sale Date | Federal Lease Number | Total Acres | Total Amount Paid | |
|---|---|---|---|---|
| 8/4/2009 | WYW-178516 | 2127 | $ | 92,664.50 |
| 10/2/2009 | WYW-178703 | 320 | $ | 5,425.00 |
| 8/3/2010 | WYW-179269 | 1782 | $ | 86,572.00 |
| | | | | |
| **TOTAL** | | **4,229** | **$** | **184,661.50** |